IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:19-CV-94-D

COLLINS MAHONEY,                    )
                                    )
                    Plaintiff,      )
                                    )
        v.                          )        **ORDER**
                                    )
SPIRIT AEROSYSTEM, INC.,            )
                                    )
                    Defendant.      )

On June 24, 2019, Collins Mahoney ("Mahoney" or "plaintiff") filed a complaint against

Spirit Aerosystem, Inc. ("Spirit" or "defendant") alleging a retaliation claim under Title VII of the

Civil Rights Act, 42 U.S.C. § 2000e, et seq. [D.E. 1]. On August 28, 2020, Spirit moved for

summary judgment [D.E. 15] and filed a statement of material facts [D.E. 16], exhibits [D.E. 16-

1–6], and a memorandum in support [D.E. 17]. On September 25, 2020, Mahoney responded in

opposition [D.E. 20] and filed responsive statements of material fact [D.E. 20-1–2] and exhibits in

support [D.E. 20-3–6]. On October 9, 2020, Spirit replied [D.E. 21]. As explained below, the court

grants Spirit's motion for summary judgment.

I.

Spirit is headquartered in Wichita, Kansas, and designs and builds components and parts for

commercial aircraft as well as complex tooling for aircraft assembly and manufacturing. Spirit has

manufacturing facilities in Tulsa, Oklahoma, and Kinston, North Carolina. See Mahoney Dep. [D.E.

16-2] 4–5; Rubio Dep. [D.E. 16-5] 5; George Dep. [D.E. 16-6] 4–5. From 2016 to July 2018, Terry

George ("George") served as the Vice President and General Manager of Spirit's Kinston facility.

See George Dep. [D.E. 16-6] 4–5. Since 2015, Hilario Rubio ("Rubio") has served as Director of

Operations at Spirit's Kinston facility. See Rubio Dep. [D.E. 16-5] 4–5. From June 2017 to June

2018, Jack Jones ("Jones") served as a senior manager at Spirit's Kinston facility. See Mahoney Dep. [D.E. 16-2] 15–16; Jones Decl. [D.E. 16-3] ¶ 3. At all relevant times, Jones reported to Rubio who reported to George. See Rubio Dep. [D.E. 16-5] 6, 14; George Dep. [D.E. 16-6] 6.

Mahoney, an African-American male, has worked for Spirit since 2005. See Mahoney Dep. [D.E. 16-2] 4. Mahoney's first job with Spirit was as a Shipping Coordinator in Spirit's logistics department in Tulsa. See id. at 4–5. The Shipping Coordinator position is a non-managerial position in which Mahoney was responsible for coordinating all of Spirit's shipments for Boeing's 737 program. See id. at 5. In 2012, to be closer to his family, Mahoney transferred to Spirit's Kinston facility where he continued to work as a Shipping Coordinator. See id. at 5–6.

In August 2016, Spirit promoted Mahoney to Move Team Manager, a managerial position. See id. at 7; Jones Decl. [D.E. 16-3] ¶ 3. As Move Team Manager, Mahoney supervised a group of employees who were tasked with moving tools in and out of Spirit's process areas. See Mahoney Dep. [D.E. 16-2] 10. Mahoney's duties included ensuring that his employees adhered to Spirit's workplace rules by reporting to work on time, not wasting company resources, correctly completing their timesheets and work-related checklists, and completing their work correctly and efficiently. See id. at 10–12.

According to Spirit's discipline policy, when an employee violated Spirit's workplace rules, that employee's manager had to discipline the employee. See id. at 12; Jones Decl. [D.E. 16-3] ¶ 4. Under this policy, the manager had to issue the discipline within 30 days of an employee's infraction. See [D.E. 16-2] 54; Jones Decl. [D.E. 16-3] ¶ 4. Discipline not issued within the 30-day window expired. See Jones Decl. [D.E. 16-3] ¶ 4. Managers who failed to discipline employees within the 30-day window or who otherwise failed to hold their employees accountable for failing to meet workplace expectations were themselves subject to discipline for policy violations. See id.

Beginning in June 2017, Mahoney reported directly to Jones. See id. ¶ 3; Mahoney Dep. [D.E. 16-2] 13. Jones supervised four other managers. See Mahoney Dep. [D.E. 16-2] 25. After

2

Mahoney began reporting to Jones, Mahoney's employees committed multiple infractions but Mahoney failed to discipline them within the 30-day window. Specifically, in August 2017, one employee misused company time and three other employees failed to sign off vehicle checklists designed to prevent Spirit from violating Federal Aviation Administration safety policies. See id. at 54; Jones Decl. [D.E. 16-3] ¶¶ 6–7. Between August 8 and 9, 2017, Spirit's human resource generalist, Josie Krieger ("Krieger"), provided Mahoney with disciplinary actions for Mahoney to issue to the four employees. See [D.E. 16-2] 54. However, Mahoney went on vacation, failed to issue those written disciplines within the 30-day window, and they expired. See id. at 54, 68–69; Jones Decl. [D.E. 16-3] ¶ 6; [D.E. 16-4] 20. As such, on October 2, 2017, Jones disciplined Mahoney for his failure to issue the four written disciplines within the 30-day window. See [D.E. 16-2] 54; Jones Decl. [D.E. 16-3] ¶ 6. Mahoney's Disciplinary Action Form for this incident stated:

> As a First-Level Manager, you have failed to hold your team accountable. Issuing discipline is one of the tools Managers use to correct an Employee's behavior that is not compatible with our Company's guidelines. Since July 2017, you have failed to issue Disciplinary Memos to 4 Employees. This is a violation of Company policy PRO-3885 (Disciplinary Guidelines) for failure to complete assigned work given to you as a First-Level Manager. This behavior is unacceptable and will not be tolerated.

[D.E. 16-3] 10. The Disciplinary Action Form also warned that "[a]s a Spirit employee, it is imperative you follow the instructions given to you by your Manager," and that "[f]uture incidents of this nature may result in further disciplinary action up to and including termination of employment." Id. Mahoney refused to sign the form and provided no statements in the form's "Employee Comments" section. See id.

After Mahoney's October 2, 2017 discipline, Rubio, Jones's supervisor, followed up with Mahoney to ensure that the vehicle checklists were correct and up to date. Mahoney told Rubio that they were. See [D.E. 16-2] 54. On October 5 and 9, 2017, however, a Spirit auditor and Jones discovered that Mahoney's employees again had failed to sign off the vehicle checklists as required. See id.; Jones Decl. [D.E. 16-3] ¶ 8. Accordingly, on November 1, 2017, Jones disciplined Mahoney

3

a second time. See [D.E. 16-2] 54; Jones Decl. [D.E. 16-3] ¶ 8. The second Disciplinary Action Form stated:

> You were issued discipline on 10/2/2017 for failing to hold your Team accountable. Some of the disciplines you did not issue were related to Employees failing to sign off the MGV Checklist. On Thursday (10/5/2017), our Auditor (Margie Taylor) again found another MGV that was not in compliance and has issued an Audit Finding. Then on Monday (10/9/2017), while I was walking around inspecting the MGV Checklists to ensure we are being compliant, I noticed MGV 1 was not signed off and it was being used in the Spar Clean Room specifically in the Transfer Station. This is a violation of Company policy, PRO-3885 (Disciplinary Guidelines), for failure to complete assigned work given to you as a First-Level Manager. This behavior is unacceptable and will not be tolerated.

[D.E. 16-3] 12. The Form again warned that "[f]uture incidents of this nature may result in further disciplinary action up to and including termination of employment." Id. Again, Mahoney refused to sign the Form and provided no statements in the form's "Employee Comments" section. See id.

Later in November 2017, another of Mahoney's subordinates accrued three unexcused absences and thereby violated Spirit's workplace policies. When Jones asked Mahoney about the unexcused absences, Mahoney was unaware of them. As such, on December 4, 2017, Jones disciplined Mahoney a third time. See id. ¶ 9. The third Disciplinary Action Form stated:

> While searching for Montera Cogdell (you were out on ETO), I discovered some discrepancies on [Cogdell's] attendance logins at the kiosk. I asked Security to pull up [Cogdell's] Gate Report and saw some discrepancies as well. On Friday (11/3/2017), I asked you if you could explain why Montera has not been clocking in and out, and if he has contacted you every time he was going to be late. In addition to comparing the reports, I also asked Montera to clock in at the kiosk since he did not clock in [] at the beginning of his shift on 11/3/2017. I observed him clock in and then asked you to pull up his Clocking report. The report showed that Montera can clock in. Lastly, I then asked you if you were aware that Montera had 3 Unexcused Absences at which time you stated you were not aware. This is a violation of Company policy, PRO-3885 (Disciplinary Guidelines), for failure to complete assigned work given to you as a First-Level Manager. This behavior is unacceptable and will not be tolerated.

Id. at 14. The form once again warned that "[f]uture incidents of this nature may result in further disciplinary action up to and including termination of employment." Id. Additionally, the form noted that, under Spirit's progressive discipline policy and "[a]s a result of your actions, you are

4

being suspended for a period of 3 days." Id. As with his other Disciplinary Action Forms, Mahoney refused to sign, but this time wrote "See case notes provided to HR" in the form's "Employee Comments" section. Id. Jones explained, "I disciplined Mr. Mahoney because I wanted him to succeed as a manager at Spirit." Id. ¶ 10.

In response to these disciplinary actions, Mahoney filed three complaints in Spirit's internal reporting database ("EthicsPoint"). See id. ¶ 11; [D.E. 16-4] 2–14, 32–35. On October 2, 2017, the same day that Jones issued Mahoney's first written discipline, Mahoney entered an EthicsPoint complaint alleging that Jones told Mahoney "very rudely" that if he could not ensure that his team moved tools correctly he "should be replaced." [D.E. 16-4] 8. Mahoney alleged that the comment was made "in a very threatened manner." Id. Mahoney also commented that "I have been told to write up people because Jack Jones, my boss wants them written up and has accused me of poor work performance for not doing so." Id. Mahoney acknowledged that he had not issued written discipline to his employees and stated that Jones "approached [him] in early September 2017 [and said] that he was going to write me up for NOT submitting disciplines." Id. Mahoney said that he had tried to explain to Jones his reasons for not issuing the disciplines but that Jones "told me he did not want to hear it and would NOT let me explain the concerns I had." Id. Lastly, Mahoney noted that he had not received a performance review from Jones. See id. Mahoney's October 2, 2017 EthicsPoint complaint did not mention race. See id.

On November 28 2017, Mahoney made a second EthicsPoint complaint. See id. at 32. Mahoney mentioned his October 2, 2017, and November 1, 2017 disciplinary actions and stated that Jones had accused him of "not performing [his] manager duties." Id. at 33. Mahoney stated that he believed Jones's discipline was motivated by a desire "to remove me from the supervisor position for unknown reasons other than to harass and discriminate to cause me to give up my position as manager." Id.

On December 5, 2017, Mahoney made a third EthicsPoint complaint. See id. at 2. In that

5

complaint, Mahoney alleged that the "Spirit Fabrication management team wants another person to manage[] move team and want[s] me out of this position." Id. at 3. Mahoney explained that he believed

> this is a deliberate attempt to move me out of this position or to get me fired. I believe they want a white employee in this position, pla[i]n and simple. So to that end false and misleading disciplines have been drafted (now 3) to get me suspended from work and have this lead to my termination.

Id.

In response to Mahoney's complaints, Spirit investigated. See id. at 16–31. During its investigation, Spirit interviewed Mahoney, Jones, Krieger, and Jason Trull ("Trull"), a Spirit human resources employee. See id. at 24–31. Spirit also reviewed Mahoney's and Jones's disciplinary records. See id. at 20–22.

During Mahoney's interview, Mahoney reiterated the allegations from his three complaints. See id. at 24–27. Mahoney acknowledged that he failed to discipline his subordinates in writing, but explained that "[a]s a manager I thought I had the discretion to talk to [my employees] as a tool." Id. at 25; see [D.E. 16-2] 36–47. Mahoney also admitted the he was not sure how the disciplinary process worked. See [D.E. 16-4] 25. Nonetheless, Mahoney explained that he thought Jones's treatment of him was "retaliatory" and had created a "hostile environment." Id. at 26. Mahoney said he was experiencing "harassment" because Jones was "rude" to him and "treated [him] like a child or hourly employee," and that he felt "threatened" when Jones mentioned that he may lose his job because of his performance. Id. at 24, 26. Mahoney said that he had not been "given any people to properly manage my job on a permanent basis until a few months ago," and that he and others "have not received job performance reviews." Id. at 24.

During Jones's interview, Jones explained that he believed Mahoney's complaints were unfounded because he had disciplined Mahoney to hold him accountable for failing to adhere to Spirit's workplace policies. Specifically, Jones recalled that he had conversations with Mahoney

6

about "holding employees accountable" and about Spirit's progressive discipline policy. Id. at 27. Later, when Jones observed Mahoney's employees violating workplace rules, he followed up with Mahoney to verify that he was holding those employees accountable and Mahoney answered in the affirmative. See id. Nonetheless, Jones discovered from Spirit's human resources department that Mahoney was failing to administer Spirit's discipline policy. See id. When Jones asked Mahoney to show him documentation that he was counseling and disciplining his employees, Mahoney "could not show me anything." Id. at 28. Jones told Mahoney "that if he did not hold his employees accountable it would escalate and [Jones] would be holding [Mahoney] accountable." Id. Jones acknowledged that he disciplined Mahoney on three occasions because Mahoney's conduct had not improved. See id. Jones also responded to Mahoney's claims about not having enough people to do his job and not receiving a job performance review. Specifically, Jones said that "[t]o some extent[,] all managers say they do not have enough employees." Id. at 27. Jones also explained that he had not given Mahoney a job performance review because Spirit's policies did not require a review at that time. Id. at 28.

Jones also acknowledged that he had learned of Mahoney's ethics complaints. See id. Jones could not recall if he had discussed those complaints with Mahoney, but denied that he singled out Mahoney with threats that he would lose his management position. See id. at 27–28. Instead, Jones said that he told his entire management team that "if we do not improve our quality and delivery we could all be replaced . . . me included." Id. at 27. Finally, Jones summarized his perception of Mahoney's work performance and said that his overall impression was that Mahoney had "a hard time" setting expectations for and disciplining his subordinates and that "[i]t did not seem like he wanted to have those difficult conversations or make those decisions." Id. at 28.

During Krieger and Trull's interviews, they discussed Jones's and Mahoney's work performance. Trull noted that Jones "is the type of manager who likes to have discipline issued to hold employees accountable." Id. at 29. Trull also explained that although Jones was "a tough

manager and expects everyone to do their best," he did "not single out anyone" and was "consistent across his whole team." Id. at 30. Krieger observed that Jones "is consistent in holding personnel accountable for failing to meet standards." Id. at 31.

Discussing Mahoney, Trull said that Mahoney was "the type of person who would just rather work and not be bothered and left alone," and that he did not think that Mahoney "likes to have . . . difficult conversations [about discipline] with employees or even with his manager." Id. at 29. After Mahoney was suspended in November 2017, Jones told Trull he planned to put Mahoney on a "performance improvement plan . . . or offer [Mahoney] a position in a non-management role." Id. at 29–30. Krieger explained that she had spoken with Mahoney on multiple occasions and that it seemed as though Mahoney did not understand "basic things" regarding workplace rules and policies. Id. at 30. Krieger recounted Mahoney's various failures to issue written discipline to employees, and noted that Jones's "impression is that [Mahoney] does not have it within to have difficult conversations with employees and does not hold his team accountable." Id. Krieger also said that, at one point, another manager, "Paul Gentry[,] was a focus for [Jones]" and that Jones had placed Gentry "on a coaching plan." Id. at 31. Krieger stated that "[n]ow, [Mahoney] is the one from [Jones's] team that is getting attention." Id.

In addition to these interviews, the investigation examined records of Jones disciplining his employees. Those records substantiated the three disciplinary actions Jones issued to Mahoney but also indicated that Jones had disciplined Paul Gentry, a Caucasian manager, on three occasions between October 2016 and November 2017, including for failing to monitor timecards and for being "[u]nable to effectively lead, train, and manage" his team. Id. at 22. The investigation also examined Mahoney's discipline records. These records, inter alia, showed that Mahoney had not issued the four disciplines that human resources sent to him in August 2017. See id. at 21.

In its final report regarding Mahoney's EthicsPoint complaints, Spirit's investigators concluded that "[b]ased on the information gathered in this investigation, there is insufficient

8

eviden[ce] to substantiate" violations of Spirit's policies regarding discrimination and harassment. Id. at 23. On December 15, 2017, Spirit's investigator, Brenda Zobklw, sent Mahoney an email with a copy of the investigation report telling him that Spirit was concluding its investigation because investigators "were unable to substantiate [Mahoney's] allegations." Id. at 34.[1]

After the conclusion of the December 2017 investigation, Mahoney did not file another EthicsPoint complaint against Jones for six months. By May 2018, Jones believed that "Mahoney's performance was still unsatisfactory." Jones Decl. [D.E. 16-3] ¶ 13. Mahoney's employees continued to violate Spirit's workplace policies. Thus, on May 22, 2018, Jones disciplined Mahoney a fourth time. EthicsPoint indicates that Jones stated that Mahoney had "failed to perform his duties as a manager in upholding Spirit's policies." [D.E. 16-4] 61. Specifically, one of Mahoney's employees had "5 days [where] he did not clock in" and that two other employees had been tardy five times in a rolling eight week period. Id. Mahoney did not discipline those three employees as required. See id. Krieger reviewed Mahoney's fourth written discipline and placed a note in that document listing Mahoney's three previous written disciplines and noting that Mahoney's conduct "may lead to a [termination]." Id.

Following Mahoney's four written disciplines, Jones "decided to submit [Mahoney's] performance to a Termination Review Board" ("TRB") in May 2018. See Jones Decl. [D.E. 16-3] ¶ 14. A TRB is a meeting of an employee's first and second-level managers as well as Spirit's human resources and legal departments to discuss an employee's proposed termination. See id. ¶ 15. The May 22, 2018 EthicsPoint report states that Jones was "advised to proceed w/ the Pre-TRB that was scheduled for 5/31/2018." [D.E. 16-4] 60. Spirit, however, never advised Mahoney that a TRB was scheduled. See Mahoney Dep. [D.E. 16-2] 21.

───────────────

[1] Although the title page of the investigation report indicates that Jones reported to Rubio and George, the report does not state, and the record does not indicate, that Rubio or George were made aware of the investigation or the resulting report. See [D.E. 16-4] 16.

On June 11, 2018, as a result of Jones's fourth written discipline, Mahoney scheduled an appointment to meet with George, the vice president to whom Jones's supervisor, Rubio, reported. During that appointment, Mahoney met George in George's office to discuss Mahoney's concerns about Jones. See id. at 22–23. Mahoney told George that he "had been approached on several occasions by Jack Jones in a demeaning manner to me, that he wasn't going to talk to me any kind of way, and basically I just needed it to stop." Id. at 23. Mahoney did not explain to George what he meant by "demeaning," but later testified that he was trying to communicate that Jones's conduct was an attack on his credibility, his manhood, and his background as a manager. See id. at 23–24. Mahoney did not mention race, harassment, or his EthicsPoint complaints during his meeting with George. See id. at 22–25. In response, George told Mahoney, "[g]ive me a couple of days, and I'll check into it." Id. at 23.

In June 2018, Mahoney also met with Jones's supervisor, Rubio. See id. at 16–17. During that meeting, Rubio told Mahoney that he was going to move Mahoney out of the Move Team Manager role and that Mahoney should prepare to transfer to another department. See id. at 16. Rubio decided to transfer Mahoney out of his managerial role due to Mahoney's poor performance as a manager. See [D.E. 16-5] 10–13; [D.E. 17] 20–25. Later that week, Rubio spoke with Mahoney. See Mahoney Dep. [D.E. 16-2] 17; Rubio Dep. [D.E. 16-5] 8. Rubio offered Mahoney the opportunity to become a composite mechanic ("CO3"), but Mahoney told Rubio he was not interested in that position. See Mahoney Dep. [D.E. 16-2] 18; Rubio Dep. [D.E. 16-5] 8–10. Instead, Mahoney asked Rubio about returning to Spirit's logistics department. See Mahoney Dep. [D.E. 16-2] 19; Rubio Dep. [D.E. 16-5] 8. Rubio then spoke with Lance Nunnery ("Nunnery"), head of Spirit's logistics department, and arranged for Mahoney's transfer. See Mahoney Dep. [D.E. 16-2] 19; Rubio Dep. [D.E. 16-5] 8. During this process, Rubio never spoke with George about Mahoney's June 11, 2018 complaint or about Mahoney's pending transfer. See [D.E. 16-5] 7, 14.

On June 29, 2018, Mahoney completed his transfer to Spirit's logistics department as a

Shipping and Receiving Clerk, a non-managerial position. See Mahoney Dep. [D.E. 16-2] 8, 19–21; Jones Decl. [D.E. 16-3] ¶ 3. Following his transfer, Mahoney emailed Nunnery and asked if he could retain his management salary in his new position. See [D.E. 16-2] 51. On July 19, 2018, Nunnery responded that he had placed Mahoney "on the top end of what compensation recommended based on experience and job level," but that "[t]he position on my team [is] not a management role, so [Mahoney's] pay could not stay the same." Id. Accordingly, Mahoney remains a Spirit employee, but is no longer a manager and his salary has been reduced by approximately $9,000 per year.

## II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252;

11

see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248; Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006).

Mahoney has no direct evidence of retaliation and proceeds under the burden-shifting framework. To state a prima facie claim for retaliation in violation of Title VII, an employee must show that (1) he engaged in protected activity, (2) his employer took an action against him that a reasonable employee would find materially adverse, and (3) a casual connection existed between the protected activity and the adverse employment action. See DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015); Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015); Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc); Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 410 (4th Cir. 2013); Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543 (4th Cir. 2003); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 190 (4th Cir. 2001); Brown v. Goodwill Indus. of E. N.C., Inc., No. 4:17-CV-144-D, 2018 WL 2422315, at *2 (E.D.N.C. May 29, 2018) (unpublished); Johnson v. Pitt Cnty. Bd. of Educ., No. 4:16-CV-214-D, 2017 WL 2304211, at *12 (E.D.N.C. May 25, 2017) (unpublished); see also Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362–63 (2013); Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 67–70 (2006).

If a plaintiff pleads a prima facie retaliation claim, the burden shifts to "the employer to rebut the presumption of retaliation by articulating a legitimate[,] nonretaliatory reason for its actions." Beall v. Abbott Lab'ys, 130 F.3d 614, 619 (4th Cir. 1997), abrogated in part on other grounds by Gilliam v. S.C. Dep't of Juv. Just., 474 F.3d 134 (4th Cir. 2007); see Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the

12

plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc) (quotation omitted), abrogated on other grounds by Nassar, 570 U.S. at 360; see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142–43 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can do so by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted); see Reeves, 530 U.S. at 147.

### III.

In seeking summary judgment, Spirit argues that Mahoney has failed to state a prima facie retaliation claim. Specifically, Spirit argues that Mahoney's June 11, 2018 complaint is not "protected activity" and that Mahoney cannot demonstrate that his June 11, 2018 complaint was a but-for cause of his transfer. See [D.E. 17] 17–22.[2] Alternatively, Spirit argues that, even if Mahoney has stated a prima facie retaliation claim, no rational jury could find that Spirit's stated reasons for transferring Mahoney are pretextual. See id. at 22–25.

### A.

Spirit contends that Mahoney's June 11, 2018 complaint to George was not protected activity. Title VII's retaliation provision prohibits an employer from discriminating against any individual because he engaged in protected activity, that is, "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). An employee engages in protected activity when he opposes "employment actions actually unlawful under Title VII [or] employment actions [he] reasonably

---

[2] The parties agree that Mahoney's transfer was an adverse employment action. See [D.E. 17]; [D.E. 20] 7–8; [D.E. 21].

13

believes to be unlawful." Boyer-Liberto, 786 F.3d at 282 (alteration and quotation omitted); see E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005); Peters v. Jenney, 327 F.3d 307, 320 (4th Cir. 2003). Protected activity may fall into two categories, opposition and participation. Only opposition is relevant here. Protected opposition includes "staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities" as well as making "complaints about suspected violations." Navy Fed., 424 F.3d at 406 (alterations and quotations omitted); see DeMasters, 796 F.3d at 417; Bryant, 333 F.3d at 543–44.

Mahoney alleges that his complaint to George during their June 11, 2018 meeting was protected opposition. See Compl. [D.E. 1] ¶ 25; Mahoney Dep. [D.E. 16-2] 22; [D.E. 20-2] 17–18. During that meeting, Mahoney told George that on several occasions Jones had approached Mahoney in a "demeaning manner" and had told Mahoney that "he wasn't going to talk to [Mahoney] any kind of way, and that Mahoney "just needed [Jones's conduct] to stop." Mahoney Dep. [D.E. 16-2] 23. Mahoney also told George that Jones had "addressed [him] in a manner, as if [he] was a child, by saying 'look at me when I'm talking to you' in front of [Jones's] bosses, [and Mahoney's] peers" and that Jones had once told Mahoney "'I don't want to hear nothing you got to say.'" Id. at 24. Mahoney admits that he did not explain to George what he meant by "demeaning manner," but testified that he believed he was communicating that Jones's behavior was "an attack on [his] credibility, an attack on [his] manhood and [his] background as a manager." Id. Mahoney concedes that he never mentioned race during his conversation with George. See id. at 22–25; [D.E. 20-2] 18. Nonetheless, Mahoney claims that George knew that his June 11, 2018 complaint involved opposition to race discrimination because George's name was listed on the December 2017 investigation report. See [D.E. 20-1] ¶ 17. Mahoney argues that "[c]onsidering these facts, [Spirit] should have reasonably understood that [Mahoney's June 11, 2018 complaint] was continuing his complaint about harassment based on race, not general workplace issues." [D.E. 20] 7.

Viewing the evidence in a light most favorable to Mahoney, Mahoney's June 11, 2018

14

complaint to George only raised concerns about Jones's communication and management styles and was not opposition to race discrimination. See Mahoney Dep. [D.E. 16-2] 22–25. As for Mahoney's allegations that George understood that Mahoney's June 11, 2018 complaint was a continuation of his December 5, 2017 complaint about alleged race discrimination, Mahoney's only evidence is that the December 5, 2017 complaint's investigation report "states that . . . Jones reports to . . . Rubio . . . who reports to . . . George." [D.E. 20-1] ¶ 17; see [D.E. 20] 7.[3]  Mahoney presents no evidence that George was aware of Mahoney's December 5, 2017 complaint or that Mahoney mentioned his racial complaint during his June 11, 2018 conversation with George. Cf. Mahoney Dep. [D.E. 16-2] 22–25 (recounting no reference to Mahoney's December 5, 2017 complaint); George Dep. [D.E. 16-6] 6–7 (stating that George did not know Mahoney and was unaware of any complaints Mahoney made against Jones). Although Mahoney complained to George on June 11, 2018, that Jones's conduct was "demeaning," Title VII does not create "a general civility code for the American workplace," and does not prohibit mere rude or insensitive conduct. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); see Bonds v. Leavitt, 629 F.3d 369, 385–86 (4th Cir. 2011); Baqir v. Principi, 434 F.3d 733, 746–47 (4th Cir. 2006). Even viewing the record in a light most favorable to Mahoney, no rational jury could find that Mahoney's June 11, 2018 complaint to George opposed employment actions actually unlawful under Title VII or which Mahoney reasonably believed to be unlawful under Title VII. See DeMasters, 796 F.3d at 417; Boyer-Liberto, 786 F.3d at 282; Navy Fed., 424 F.3d at 406; Bryant, 333 F.3d at 543–44; Peters, 327 F.3d at 320.

In response, Mahoney makes two arguments. First, Mahoney contends that he reasonably believed his June 11, 2018 complaint to George was opposing a Title VII violation, namely, a racially hostile work environment. See [D.E. 20] 4–6. Second, Mahoney cites Okoli v. City of Baltimore, 648 F.3d 216 (4th Cir. 2011), and argues that Spirit through George should have known

---

[3] The court agrees that Mahoney's December 5, 2017 EthicsPoint complaint expressly referenced alleged race discrimination and constitutes protected "opposition" activity under Title VII.

that his June 11, 2018 complaint was a continuation of his December 5, 2017 complaint about race-based harassment. See id. at 6–7.

As for Mahoney's racially hostile work environment argument, Mahoney claims that his June 11, 2018 complaint was protected activity because Jones's conduct provided him with a reasonable basis to oppose what he perceived as a racially hostile work environment. See id. at 5. "[A]n employee seeking protection from retaliation must have an objectively reasonable belief in light of all of the circumstances" that conduct giving rise to a hostile work environment in violation of Title VII has happened or is in progress. Boyer-Liberto, 786 F.3d at 282 (citation and quotation omitted); see Jordan v. Alt. Res. Corp., 458 F.3d 332, 340–41 (4th Cir. 2006) abrogated on other grounds by Boyer-Liberto, 786 F.3d at 268–69. To demonstrate a hostile work environment claim under Title VII, an employee must prove that (1) he experienced unwelcome conduct, (2) the conduct was based on a protected characteristic under Title VII, (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) the conduct is imputable to the employer. See, e.g., Perkins v. Int'l Paper Co., 936 F.3d 196, 207–08 (4th Cir. 2019); Parker v. Reema Consulting Servs., Inc., 915 F.3d 297, 302 (4th Cir. 2019); Boyer-Liberto, 786 F.3d at 277; Okoli, 648 F.3d at 220; E.E.O.C. v. Fairbrook Med. Clinic, P.A., 609 F.3d 320, 327 (4th Cir. 2010). An employee also must show that his protected characteristic under Title VII was the "but for" cause of the alleged harassment. See, e.g., Gilliam, 474 F.3d at 142.

To determine whether conduct was sufficiently severe or pervasive to alter the employee's terms and conditions of employment and create an abusive working environment based on a protected characteristic, a court must examine the allegations both subjectively and objectively. See, e.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993). First, the employee must subjectively consider the conduct to be sufficiently severe or pervasive so as to alter his conditions of employment. See, e.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001) (per curiam); Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998); Boyer-Liberto, 786 F.3d at

16

277. Second, a court must view the conduct from the perspective of a reasonable person in the employee's position to determine whether the conduct is objectively severe or pervasive. See, e.g., Breeden, 532 U.S. at 271; Faragher, 524 U.S. at 787–88; Oncale, 523 U.S. at 81–82; Boyer-Liberto, 786 F.3d at 277.

The objective component helps courts "to police the baseline for hostile environment claims." Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc) (quotation omitted). The court considers all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Forklift Sys., 510 U.S. at 23; see Parker, 915 F.3d at 304. The conduct must be severe or pervasive to be actionable. See Forklift Sys., 510 U.S. at 23; Faragher, 524 U.S. at 787–88; Boyer-Liberto, 786 F.3d at 277–78. Title VII does not create "a general civility code for the American workplace." Oncale, 523 U.S. at 80; see Irani v. Palmetto Health, 767 F. App'x 399, 416 (4th Cir. 2019) (per curiam) (unpublished). Rather, the "conduct must . . . amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788; see Boyer-Liberto, 786 F.3d at 277–81. Simple teasing, sporadic rude language, offhand comments, jokes related to a protected status, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. See Burlington N., 548 U.S. at 68–69; Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 788; cf. Boyer-Liberto, 786 F.3d at 277–81. Likewise, mere rude or insensitive treatment cannot sustain a hostile work environment claim. See, e.g., Bonds, 629 F.3d at 385–86; Baqir, 434 F.3d at 746–47; see also Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Oncale, 523 U.S. at 81–82; cf. Boyer-Liberto, 786 F.3d at 277–81; Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 207–10 (4th Cir. 2014); Freeman v. Dal-Tile Corp., 750 F.3d 413, 420–24 (4th Cir. 2014); Okoli, 648 F.3d at 220–22. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully

17

captured by simple recitation of the words used or physical acts performed." Oncale, 523 U.S. at 81–82. "Common sense, and appropriate sensitivity to social context," will enable courts to distinguish between teasing, distasteful jokes, sporadic rude language, vulgarity, stupidity, offhand comments, and insensitive treatment and "conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive" based on a protected characteristic. Id. at 82 (emphasis added); see Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772–73 (4th Cir. 1997).

Although hostile work environment claims often involve repeated conduct, an "isolated incident of harassment can amount to discriminatory changes in the terms and conditions of employment, if that incident is extremely serious." Boyer-Liberto, 786 F.3d at 277 (quotations and alterations omitted); see Pryor v. United Air Lines, Inc., 791 F.3d 488, 496 (4th Cir. 2015); Okoli, 648 F.3d at 220 & n.5. Furthermore, in assessing the severity of the conduct, the status of the harasser is an important factor. See Boyer-Liberto, 786 F.3d at 278; Sonnier v. Diamond Healthcare Corp., 114 F. Supp. 3d 349, 356 (E.D. Va. 2015). A "supervisor's power and authority invests his or her harassing conduct with a particular threatening character." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763 (1998); see Boyer-Liberto, 786 F.3d at 278.

Mahoney contends that he reasonably believed that Jones had created a racially hostile work environment. See [D.E. 20] 5–6. In support, Mahoney references his complaints about Jones in which he alleged that Jones "very rudely" critiqued his work performance, "'accused [Mahoney] of not performing [his] manager duties,'" and "approached [Mahoney] in a demeaning manner." See id.; [D.E. 16] ¶¶ 41–45; [D.E. 16-2] 22–24. Mahoney argues that these complaints demonstrate that Jones's treatment of him was "consistent, threatening, and demeaning." [D.E. 20] 6.

The court assumes without deciding that Jones's conduct was unwelcome, imputable to Spirit, and that Mahoney subjectively perceived his work environment as racially abusive or hostile. However, even viewing the evidence in a light most favorable to Mahoney, no rational jury could find that a reasonable employee would believe that Mahoney's work environment was objectively

racially abusive or hostile. As for Jones's comments and conduct, Jones never used a racial epithet or racial insult, never physically threatened Mahoney, and never mentioned Mahoney's race or any other protected characteristic when communicating with Mahoney or disciplining Mahoney for failing to adhere to Spirit's workplace policies. Moreover, Mahoney presents no evidence of a "workplace [] permeated with discriminatory intimidation, ridicule, and insult." Jordan, 458 F.3d at 339; see Breeden, 532 U.S. at 271; Forklift Sys., 510 U.S. at 21. Instead, in Mahoney's own words, Jones criticized Mahoney's work performance in a manner which Mahoney considered "rude[]" and "demeaning." [D.E. 16] ¶¶ 41–45; see [D.E. 16-2] 22–24.

"In a perfect world, each workplace would be entirely harmonious and no . . . co-worker [or supervisor] would ever make an insensitive comment, irritate a colleague, or engage in a petty slight." Iskander v. Dep't of Navy, 116 F. Supp. 3d 669, 677 (E.D.N.C.), aff'd, 625 F. App'x 211 (4th Cir. 2015) (per curiam) (unpublished). "Congress and the Supreme Court, however, have made clear that Title VII does not require such a utopian workplace in order for an employer to avoid liability for a hostile work environment." Id. (collecting cases). After all, common experience and collective wisdom teach that people are not angels. Some people are demanding, rude, and unkind. The court recognizes that Jones was Mahoney's supervisor, a status that carries special weight, and that Jones's conduct may have been rude, demeaning, and "an attack on [Mahoney's] credibility . . . manhood . . . and [] background as a manager." [D.E. 16-2] 22–24; see Ellerth, 524 U.S. at 763; Boyer-Liberto, 786 F.3d at 278. However, contrary to "physically threatening or humiliating" comments or conduct that "unreasonably interfere with an employee's work performance," Jones's allegedly "rude" and "demeaning" critiques of Mahoney's performance as a manager are not "the stuff of which a racially hostile work environment is made." Boyer-Liberto, 786 F.3d at 272, 274 (quotation omitted). Even viewing the record in the light most favorable to Mahoney, no rational jury could find Jones's comments or conduct sufficiently "severe" or "pervasive" such that Mahoney could have reasonably believed he was encountering a racially hostile work environment under Title

19

VII. See, e.g., Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Irani, 767 F. App'x at 415–17; Leavitt, 629 F.3d at 385–86; Baqir, 434 F.3d at 746–47; Hartsell, 123 F.3d at 771–74; see also Oncale, 523 U.S. at 81–82.

Mahoney also cannot demonstrate that he reasonably believed that Jones's alleged harassment was based on Mahoney's race. Again, Mahoney presents no evidence that Jones ever mentioned Mahoney's race or uttered anything about race. Nonetheless, Mahoney attempts to substantiate his allegations that Jones's critiques were based on Mahoney's race with his own affidavit that contradicts his earlier deposition testimony. Specifically, in Mahoney's affidavit opposing Spirit's motion for summary judgment, Mahoney asserts that he can show that Jones's conduct was based on his race because, according to Mahoney's own observations, Jones "spoke to Caucasian mangers differently than [how he] spoke to [Mahoney]" and Jones "singled [Mahoney] out . . . on the basis of race." [D.E. 20] 5. However, during his deposition, Mahoney claimed only that Jones provided him with a different level of "support" than the Caucasian managers, not that he spoke to Mahoney differently or singled him out based on his race. Compare [D.E. 20-1] ¶¶ 6–14 and Mahoney Decl. [D.E. 20-3] with Mahoney Dep. [D.E. 20-4] 16–17. Even if the court were to ignore Jones's testimony that all of his managers complained about the level of support they received from him, see [D.E. 16-4] 27, Mahoney cannot create a genuine issue of material fact by filing an affidavit opposing Spirit's motion for summary judgment that contradicts his prior sworn deposition testimony. See Cleveland v. Pol'y Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999); Williams v. Genex Servs., LLC, 809 F.3d 103, 110 (4th Cir. 2015) ("It is well-settled that a plaintiff may not avoid summary judgment by submitting contradictory evidence."); Stevenson v. City of Seat Pleasant, 743 F.3d 411, 422 (4th Cir. 2014); Rohrbough v. Wyeth Lab'ys, Inc., 916 F.2d 970, 974–76 (4th Cir. 1990); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment

20

as a procedure for screening out sham issues of fact." (citation omitted)). Mahoney has failed to present evidence from which a rational jury could find that he reasonably believed Jones's alleged harassment was based on his race. See, e.g., Breeden, 532 U.S. at 271; Gilliam, 474 F.3d at 142.

As for Mahoney's second argument, Mahoney cites Okoli and contends that George "should have reasonably understood" that Mahoney's June 11, 2018 complaint was continuing his December 5, 2017 complaint in which he stated "I believe they want a white employee in this position, pla[i]n and simple." [D.E. 20] 7. Thus, Mahoney argues that his June 11, 2018 complaint is protected activity.

In Okoli, a female employee's boss forcibly kissed her, repeatedly fondled her leg, propositioned her, asked her sexually explicit questions, and described sexual activities he wished to perform with her. See Okoli, 648 F.3d at 217–18. In response, the employee repeatedly and emphatically rejected her boss's sexual advances and told him to stop. See id. The employee then emailed her boss's supervisor expressing her desire to "file a harassment complaint" against her boss. Id. at 218 (internal quotation omitted). Eight days later, after the harassment had not stopped, the employee filed a formal complaint about her boss's harassment. See id. The recipient of the employee's formal complaint immediately forwarded that complaint to the employee's boss. The employee's boss fired the employee that same day. See id. The employee then filed a Title VII retaliation claim against her employer. See id. at 219. In granting the employer's motion for summary judgment, the district court found that it was "questionable" whether the employee's complaint was protected activity where the employee "made simply a general complaint about [her boss's] unprofessional behavior." Id. at 219–20 (quotations omitted). The United States Court of Appeals for the Fourth Circuit vacated and remanded, holding that the employee had presented sufficient evidence to create a genuine issue of material fact as to whether her complaint was protected activity. See id. at 223–25. The Fourth Circuit reasoned that "it was enough for [the employee] to twice complain of 'harassment,' even if it might have been more ideal for her to detail

21

the sexual incidents," because "[c]ourts and employers generally understand 'harassment' to be a term of art." Id. at 224 & n.9. Critically, the Fourth Circuit found it significant that, "based on [the employee's boss's] alleged conduct," the employee's boss "surely would have known that [the employee] was complaining of sexual harassment" when he received her complaint and fired her. See id. at 224.

Okoli does not help Mahoney. Even viewing the evidence in a light most favorable to Mahoney, on June 11, 2018, Mahoney simply mentioned "demeaning conduct" to George and did not mention "harassment," race, or any other term of art that would have alerted George that Mahoney was opposing race discrimination. See [D.E. 16-2] 22–24. Additionally, unlike in Okoli, no evidence suggests that George, the supervisor to whom Mahoney complained on June 11, 2018, had engaged in racial harassment against Mahoney from which George could infer that Mahoney's complaint referenced conduct that violated Title VII. Cf. Okoli, 648 F.3d at 224. Moreover, no evidence suggests that George was aware of Mahoney's December 5, 2017 complaint in which Mahoney suggested that Mahoney's race motivated Jones's conduct. Furthermore, no evidence suggests that George told Rubio about his conversation with Mahoney in such a way that Rubio would have reasonably believed that Mahoney's complaint related to conduct prohibited by Title VII. Even viewing the record in the light most favorable to Mahoney, no rational jury could find that Mahoney's June 11, 2018 complaint to George was protected activity. Accordingly, Mahoney has not stated a prima facie retaliation claim, and the court grants Spirit's motion for summary judgment.

B.

Alternatively, Mahoney has not stated a prima facie retaliation claim because he cannot show that a desire to retaliate was a but-for cause of his transfer. To state a prima facie retaliation claim, a plaintiff must show that "the desire to retaliate was the but-for cause of the challenged employment action." Nassar, 570 U.S. at 352; see Villa v. CavaMezze Grill, LLC, 858 F.3d 896, 900 (4th Cir.

22

2017); Guessous v. Fairview Prop. Inv., LLC, 828 F.3d 208, 216–17 (4th Cir. 2016); Huckelba v. Deering, No. 5:16-CV-247-D, 2016 WL 6082032, at *3 (E.D.N.C. Oct. 17, 2016) (unpublished). "This but-for causation requirement is stricter than the 'lessened causation standard' for discrimination claims under which a plaintiff need only show that 'race, color, religion, sex, or national origin was a motivating factor' for an adverse action by an employer." Netter v. Barnes, 908 F.3d 932, 938 (4th Cir. 2018) (citation omitted); see Foster, 787 F.3d at 249. This standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Nassar, 570 U.S. at 360; see Guessous, 828 F.3d at 217. As such, "[n]aked allegations of a causal connection between plaintiff's protected activity and the alleged retaliation do not state a plausible Title VII claim." Huckelba, 2016 WL 6082032, at *3. Where the decisionmaker is unaware that the employee engaged in protected conduct, "it stands to reason that the employer did not act out of a desire to retaliate." Villa, 858 F.3d at 901; see Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998).

Mahoney alleges that a desire to retaliate against his June 11, 2018 complaint to George was the but-for cause of Rubio's transfer of Mahoney on June 29, 2018. See Compl. [D.E. 1] ¶¶ 25–28; [D.E. 20] 8. In support, Mahoney notes the close temporal proximity between his June 29, 2018 transfer and his June 11, 2018 meeting with George. See Compl. [D.E. 1] ¶ 28; [D.E. 20] 8. Mahoney also contends that Rubio's decision to transfer him was motivated by a conversation that Rubio had with George about the June 11, 2018 meeting. See [D.E. 20] 7.

Even viewing the evidence in a light most favorable to Mahoney, no rational jury could find but-for causation. First, Rubio testified that he did not speak with George about Mahoney's June 11, 2018 meeting, about Mahoney's performance, or about Rubio's decision to transfer Mahoney. See Rubio Dep. [D.E. 16-5] 7, 14–15. Mahoney's "naked" speculation that George told Rubio about his June 11, 2018 conversation with Mahoney does not suffice to create a genuine issue of material fact about causation. Huckelba, 2016 WL 6082032, at *3; see Baqir, 434 F.3d at 746 ("conclusory

statements . . . without specific evidentiary support, cannot support an actionable [Title VII] claim."

(alteration, citation, and quotation omitted)); Holley v. N.C. Dep't of Admin., 846 F. Supp. 2d 416,

432 (E.D.N.C. 2012) ("[W]holly conjectural" arguments do not "raise a genuine issue of material

fact."). Moreover, even if Rubio and George spoke about the June 11, 2018 meeting, the record does

not indicate that either George or Rubio were aware that Mahoney had ever engaged in any type of

protected conduct, either on June 11, 2018, or on December 5, 2017. See Rubio Dep. [D.E. 16-5]

11; George Dep. [D.E. 16-6] 6–7. The record belies Mahoney's contention that George and Rubio

knew about Mahoney's December 5, 2017 complaint and would have perceived Mahoney's June 11,

2018 complaint as a continuation of his December 5, 2017 protected activity. See Villa, 858 F.3d

at 901 ("Because [Title VII's] focus is the employer's subjective motivation for the action, the facts

the decision-maker actually perceived matter. If an employer . . . never realized that its employee

engaged in protected conduct, it stands to reason that the employer did not act out of a desire to

retaliate for conduct of which the employer was not aware."); see Dowe, 145 F.3d at 657 (same); cf.

DeMasters, 796 F.3d at 421 (finding "a causal connection between [a] protected activity and the

termination of [the plaintiff's] employment" where "[t]wo days before firing him, [the company's]

management objected to [the plaintiff's] conduct, confronting him at a meeting about why he had

not taken the 'pro-employer side,' asking if he understood the liability the company could face if its

supervisor had engaged in harassment, and asserting that he had not protected [the company's]

interests and had left it 'in a compromised position.'").

 As for Mahoney's temporal proximity argument, Mahoney cites King and contends that the

short period of time between Mahoney's June 11, 2018 meeting and his June 29, 2018 transfer is

sufficient to establish causation. See [D.E. 20] 8. Where an adverse employment action occurs soon

after an employee's protected activity, temporal proximity "gives rise to a sufficient inference of

causation" to state a prima facie case. King, 328 F.3d at 151. The Fourth Circuit has not drawn a

"bright temporal line," but it has noted that a two-and-a-half month period between protected activity

and the adverse action "is sufficiently long so as to weaken significantly the inference of causation between the two events in the absence of other evidence of retaliation." Wilcox v. Lyons, 970 F.3d 452, 457 (4th Cir. 2020) (quotation omitted), petition for cert. filed, (U.S. Jan. 12, 2021) (No. 20-939); see King, 328 F.3d at 151 n.5. If Mahoney's June 11, 2018 meeting involved protected activity, the proximity between his complaint and his transfer could be sufficient to demonstrate causation. But Mahoney has not demonstrated that his June 11, 2018 meeting involved protected activity. Instead, the only protected activity Mahoney cites is his December 5, 2017 complaint about alleged racial discrimination. Absent other evidence of retaliation, the six-month period between that complaint and Mahoney's June 29, 2018 transfer significantly weakens any inference of causation. See Wilcox, 970 F.3d at 457; cf. Foster, 787 F.3d at 253; King, 328 F.3d at 151 n.5. Other evidence further undermines any inference of but-for causation. That evidence includes: (1) Mahoney's poor disciplinary record as a manager; (2) Spirit's thorough investigation of Mahoney's December 2017 allegations; (3) Spirit records indicating that the TRB process was underway in May 2018; (4) Rubio's testimony that he was unaware of Mahoney's June 11, 2018 conversation with George; and (5) Rubio's testimony that he transferred Mahoney solely due to Mahoney's poor work performance as a manager. Even viewing the evidence in a light most favorable to Mahoney, no rational jury could find that Mahoney's December 5, 2017 protected activity was the but-for cause of Mahoney's June 29, 2018 transfer.

## C.

Alternatively, even if Mahoney has stated a prima facie retaliation claim, Spirit has provided a legitimate, non-retaliatory reason for Rubio's decision to transfer Mahoney, and no rational jury could find that Spirit's justifications are pretextual and designed to mask a retaliatory motive. Once a plaintiff has stated a prima facie retaliation claim, "the burden [shifts to] the employer to rebut the presumption of retaliation by articulating a legitimate[,] nonretaliatory reason for its actions." Abbott Lab'ys, 130 F.3d at 619; see Burdine, 450 U.S. at 254; Carter, 33 F.3d at 460. This burden

is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–12 (1993). If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves, 530 U.S. at 143; King, 328 F.3d at 150–54. A plaintiff can do so by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish, 359 F.3d at 336 (quotation omitted); see Reeves, 530 U.S. at 147; Wilcox, 970 F.3d at 457. However, a plaintiff may not "rely on his own assertions of discrimination, which in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) (alteration and quotation omitted); see Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989). The "crucial issue" is whether "an unlawfully discriminatory motive for a defendant's conduct [exists], not the wisdom or folly of its business judgment." Jiminez v. Mary Wash. Coll., 57 F.3d 369, 383 (4th Cir. 1995).

In analyzing the record concerning pretext, the court does not sit to decide whether the employer in fact discriminated against the plaintiff on an illegal basis. See, e.g., Holland v. Wash. Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279–80 (4th Cir. 2000). Rather, the court focuses on whether the plaintiff has raised a genuine issue of material fact as to pretext under Reeves and its Fourth Circuit progeny. Under Reeves and its Fourth Circuit progeny, a plaintiff may not "simply show the articulated reason is false; he must also show that the employer discriminated against him on the basis of [race]." Laber v. Harvey, 438 F.3d 404, 430–31 (4th Cir. 2006) (en banc). In certain cases, however, the factfinder may infer illegal discrimination from the articulated reason's falsity. See id. at 431; Reeves, 530 U.S. at 147–48; Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000).

26

Spirit argues that Rubio transferred Mahoney because of Mahoney's poor performance as Move Team Manager, not out of a desire to retaliate against Mahoney's June 11, 2018 complaint. See [D.E. 17] 22–25. In support, Spirit has produced evidence of Mahoney's repeated failures to discipline subordinates and to hold them accountable for violating Spirit's workplace policies, Mahoney's four written disciplines for poor performance, Mahoney's suspension for poor performance, and Spirit's May 2018 initiation of a review of Mahoney's performance by Spirit's TRB. See id. at 5–7, 10–12, 22–25; [D.E. 16] ¶¶ 25–37, 55–61; Jones Decl. [D.E. 16-3] ¶¶ 5–10, 13–18; [D.E. 16-4] 15–31, 41, 47–61; Rubio Dep. [D.E. 16-5] 10–13; [D.E. 20-2] ¶¶ 25–37, 55–61; see also Williams, 871 F.2d at 456 (explaining that evidence of the plaintiff's misconduct was "entirely credible" and "overwhelming" where the defendant-employer offered numerous supervisors' "testimony . . . concerning [plaintiff's] job performance [which] was consistent[ and] fully corroborated by contemporaneously written memoranda[.]"). Spirit also has produced evidence that Rubio based his decision to transfer Mahoney out of his managerial role based on Mahoney's poor performance as a manager. See [D.E. 17] 20–25; Rubio Dep. [D.E. 16-5] 10–13. By producing evidence that Spirit transferred Mahoney because of his poor performance as a manager and that a performance review process was underway before Mahoney made his June 11, 2018 complaint, Spirit has satisfied its burden to produce evidence of a legitimate, nonretaliatory reason for Mahoney's transfer. See Hicks, 509 U.S. at 509–11; Burdine, 450 U.S. at 254; Abbott Lab'ys, 130 F.3d at 619; Carter, 33 F.3d at 460. Thus, even if Mahoney demonstrated a prima facie retaliation claim, "any presumption raised by [Mahoney's] prima facie case drops from the case," and the burden shifts back to Mahoney to create a genuine issue of material fact concerning whether Spirit's reasons for transferring him are a pretext for discrimination. Abbot Lab'ys, 130 F.3d at 619; see Reeves, 530 U.S. at 143; Burdine, 450 U.S. at 255 n.10; Hill, 354 F.3d at 285; King, 328 F.3d at 150–54.

Mahoney contends that the evidence shows that Spirit based its decision to transfer him "on

an impermissible consideration." [D.E. 20] 9 (citation and quotation omitted). Mahoney, however, does not dispute that his employees violated Spirit's policies on numerous occasions, that he failed to discipline them as required, and that Spirit disciplined him for those failures as a manager. See [D.E. 20-2] ¶¶ 25–37. Moreover, although Mahoney contests that a pre-TRB or TRB took place, he presents no evidence to contradict the evidence that Spirit initiated the TRB process in May 2018. In fact, Jones testified that he planned to submit Mahoney's performance to a TRB, and Spirit's EthicsPoint system contained a note that Mahoney's "Pre-TRB . . . was scheduled for 5/31/2018." Jones Decl. [D.E. 16-3] 17 & ¶ 18; [D.E. 20-2] ¶¶ 55–61.[4] Spirit was "free to set its own performance standards, provided such performance standards are not a mask for discrimination." Abbott Lab'ys, 130 F.3d at 619 (quotations omitted). It "is the perception of the decision maker which is relevant[,] not the self-assessment of the plaintiff." Id. at 20 (quotations omitted); see Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960–61 (4th Cir. 1996); Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1571 (7th Cir. 1989). Mahoney failed to meet Spirit's legitimate performance standards, and Spirit (via Rubio) transferred Mahoney as a result. Spirit's transfer of Mahoney was not a "disproportionate response to a minor workplace infraction," but rather the result of Mahoney's repeated failures to adhere to Spirit's workplace policies as a manager. Wilcox, 970 F.3d at 457. Spirit's record of Mahoney's poor performance as a manager "lies in stark contrast to [Mahoney's] slight evidence of discrimination . . . composed almost entirely of [his] own

---

[4] In support of his pretext argument, Mahoney also asserts that "it is unclear whether Mr. Rubio had any knowledge of Mr. Jones's plan to demote Mr. Mahoney before speaking with Mr. George about Mr. Mahoney in June 2018," that "Jones did not tell [Rubio] that Mr. Mahoney needed to be moved from his management position," and that "Mahoney was not aware of any plans for a TRB meeting regarding his management position." [D.E. 20] 8–9. Contrary to Mahoney's argument, what is unclear is how any of these facts bear on Mahoney's pretext theory. Whether Jones told Rubio he planned to request Mahoney's transfer or that Mahoney needed to be removed from his management position does not undermine Rubio's assertion that he decided to transfer Mahoney for poor performance that was well documented in Mahoney's work records. See [D.E. 16-4]. Moreover, that Mahoney did not know that Jones had initiated the TRB process does not mean that Spirit never initiated the TRB process involving Mahoney in May 2018.

28

assertions." <u>Williams</u>, 871 F.2d at 456. Thus, even viewing the evidence in the light most favorable to Mahoney, no rational jury could find that Mahoney's transfer was a pretext for illegal discrimination. <u>See</u> <u>Reeves</u>, 530 U.S. at 147; <u>Mereish</u>, 359 F.3d at 336.

IV.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 15]. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 16 day of March 2021.

J. Dever<br>
JAMES C. DEVER III<br>
United States District Judge

Case 4:19-cv-00094-D   Document 22   Filed 03/16/21   Page 29 of 29